**Reid v. City of Philadelphia**

*Gerald W. Spivak,* for plaintiffs.
*Alan C. Ostrow,* for defendant.

RAU, *J.,* September 8, 2005—

## I. INTRODUCTION

The threshold issue in this case is whether the City of Philadelphia has the same responsibilities as other private property owners to maintain the sidewalks adjacent to its real property safe from dangerous ice and snow conditions. This court found that the City was liable for failing to maintain its sidewalk in a safe condition under the real property exception of the Tort Claims Act, 42 Pa.C.S. §8542(b)(3) (real property provision). The City

admits that it had the duty[1] to keep the adjacent sidewalk property safe to pedestrians from hazardous conditions but argues that if it breached this duty, it is immune from liability under the sidewalk exception of the Political Subdivision Tort Claims Act, 42 Pa.C.S. §8542(b)(7) (sidewalk provision).

Following a one-day bench trial on liability only, this court found the City was negligent for failing in its duty to clear the dangerous accumulation of ice and snow on its sidewalk adjoining the defendant City of Philadelphia's 39th Police District Station. The City also was negligent for allowing its employees to park their private vehicles on the sidewalk, which obstructed the sidewalk and compounded the danger caused by City's failure to remove accumulated ice and snow. This court found that the accumulated ice and snow caused plaintiff Joseph Reid to fall, sustaining substantial injuries. The court awarded $75,000 in undisputed damages. *Wentz v. Pennswood Apartments,* 359 Pa. Super. 1, 518 A.2d 314 (1986).

From this court's finding of liability, the City timely filed post-trial motions that were denied. The City now appeals. The City claims that this court erred as a matter of law by finding the City liable for its negligent failure to maintain the sidewalk adjacent to its real property under the real property provision and argues that it is immune under the sidewalk provision. The City also appeals this court's factual finding that there was enough

1. The City admitted that it had a duty to "keep [its] sidewalk property free from unreasonably unsafe and hazardous conditions so as to be safe for the pedestrian public to traverse." See complaint at ¶¶6 and 13 and defendant's answer to plaintiff's complaint with new matter at ¶¶6 and 13.

accumulation of snow and ice to constitute a danger under the hills and ridges doctrine and that the City failed to maintain its sidewalk in a safe way by allowing police officers to park their vehicles on the sidewalk, compounding the danger and subjecting the City to liability.

This court found that the City was liable for its negligence[2] for failing to maintain its real property in a safe condition under the real property provision of the Tort Claims Act, 42 Pa.C.S. §8542(b)(3). *Sherman v. City of Philadelphia,* 745 A.2d 95 (Pa. Commw. 2000) (en banc) (plurality); *Kilgore v. City of Philadelphia,* 553 Pa. 22, 717 A.2d 514 (1998). This court was guided by *Sherman,* a factually similar case, where the Commonwealth Court sitting en banc held that the City would be liable as the adjacent property owner for negligently failing to maintain its sidewalk adjoining the City's Fire Administration Building. *Sherman,* 745 A.2d at 105. Likewise, in *Kilgore,* the Supreme Court held that the City could be liable for negligently failing to clear accumulated ice and snow from its roadway that caused a person significant injuries. 553 Pa. 22, 717 A.2d 514 (1998). This court's finding of liability in this case is completely consistent with precedent and should be affirmed.

## II. FACTUAL BACKGROUND

### A. *Undisputed Facts*

Mr. Reid is a certified nursing assistant who has lived at 2230 Yelland Street in the City of Philadelphia for 20

---

2. The court also found that Mr. Reid was 25 percent liable for causing his own injuries.

years. The City admitted that it owned the property adjoining the sidewalk and the sidewalk where Mr. Reid fell, which was located at 2200 Yelland Street, adjacent to the 39th Police District.[3] The City further admitted that it had the duty to "inspect, maintain, repair, upkeep and generally keep [its] sidewalk property free from unreasonably unsafe and hazardous conditions so as to be safe for the pedestrian public to traverse."[4] A City of Philadelphia ordinance in effect at the time of this incident provided:

"Section 10-720, snow removal from sidewalks.

"(1) The owner, agent and tenants of any building or premises shall clear a path of not less than 30 inches in width on all sidewalks abutting the building or premises within six hours after the snow has ceased to fall. The path shall be thoroughly cleared of snow and ice. . . ."

Ray Anthony Totten, a City custodial worker at the 39th District Station, testified that he was responsible for cleaning and shoveling the snow and ice off the police station's sidewalk on the 2200 block of Yelland Street, and detailed his shoveling responsibilities as follows: "Right here [at an alleyway on Yelland Street] would be where I would stop shoveling, that's the end of the [station's] property right there."[5] It was undisputed that Mr. Totten was acting within the scope of his employment.

---

3. See plaintiff's civil action complaint at ¶¶4, 5-7 and defendant's answer to plaintiff's complaint with new matter at ¶¶4, 5-7.

4. See complaint at ¶¶6 and 13 and defendant's answer to plaintiff's complaint with new matter at ¶¶6 and 13.

5. N.T. 01/18/05 p. 100.

It was also undisputed that Mr. Reid was not trespassing on the Yelland Street sidewalk, and the parties further stipulated that Mr. Reid sustained injuries from his fall that amounted to $100,000 in damages.

## B. *Findings of Fact*

On the evening of March 7, 2003, Mr. Reid and his wife, Sarah, and their children Malcolm, Flint and Sarah were walking home after purchasing take-out food. As they turned onto Yelland Street, they observed several cars parked on the Yelland Street sidewalk, and Mr. Reid gave highly credible testimony that these cars belonged to employees of the 39th Police District. The City had also erected a fence between its Yelland Street sidewalk and the rest of its property. The Reid family had to "squeeze in between" both the parked cars and the fence in order to walk on the sidewalk.[6] The location of the cars forced the Reid family to walk directly on the ice and snow.[7] Mr. Reid further testified that, due to the City employees' cars, he was unable to see where he was walking.[8] Mr. Reid was holding his wife Sarah's hand, and she called out to the family to "be careful" because the sidewalk was covered in ice and snow.[9] Just as Sarah called out the warning, Mr. Reid fell. Mr. Reid described the fall as follows:

"[I was] trying to walk down this ice and snow here . . . But no sooner than later I was, I guess airborne. I was up

---

6. N.T. 01/18/05 pp. 52-53.
7. N.T. 01/18/05 pp. 52-53.
8. N.T. 01/18/05 p. 55.
9. N.T. 01/18/05 p. 53.

in the air. I remember looking at the sky and coming down on my left ankle. I think I must have heard it snap before I hit the ground. So when I came down I was in excruciating pain." [10]

When asked whether the ice and snow caused him to fall, Mr. Reid replied that it had. [11] This court found Mr. Reid's testimony to be completely credible in all respects, including his description of the condition of the sidewalk and the manner and location of the fall.

### 1. The Conditions on the Sidewalk

The testimony was uncontroverted that there was ice and snow on the Yelland Street sidewalk abutting the City's real property. Mr. Reid testified that "there [was] ice and snow down there." [12] Tanya Brockenborough and David Kearney, the Fire Service Paramedics for the City of Philadelphia who attended to Mr. Reid at the site of his fall, testified that there was snow on the sidewalk where Mr. Reid was lying. [13] Mr. Totten, the City's employee, also testified that there was ice and snow remaining on the sidewalk when his shift ended at 3 p.m. on March 6, 2003, and prior to Mr. Reid's fall.

The testimony established that the snow and ice on the City's sidewalk had accumulated in ridges and elevations of such size and character as to unreasonably obstruct pedestrian travel. Mr. Kearney testified that "the

---

10. N.T. 01/18/05 p. 53.

11. N.T. 01/18/05 p. 70.

12. N.T. 01/18/05 p. 52.

13. Ms. Brockenborough could not remember whether there was also ice. N.T. 01/18/05 p. 29.

[area where Mr. Reid fell] was crunchy in a lot of places from snow." [14] Mr. Totten testified that, pursuant to his responsibilities, he had attempted to shovel the Yelland Street sidewalk where Mr. Reid fell, but that the ice was too "thick" to remove without the use of a special ice pick. Mr. Totten did not use an ice pick or other tool to remove the ice. Instead, he sprinkled "rock salt" on the sidewalk so that pedestrians might have "a better footing." [15]

The testimony further established that the ridges and elevations of snow on the City's sidewalk constituted a danger to pedestrians. Mr. Reid stated that as they were going down Yelland Street, "[b]oth sides had ice, both sides had snow." [16] Mr. Reid further testified that, upon reaching the ice and snow, "it [looked] a lot worse than we thought." [17] Mr. Reid also testified that the "whole area [was] like black ice. It's dark and it's a bad situation." [18]

In addition to the testimony given, plaintiff entered into evidence several photographs of the sidewalk in question, taken the day following Mr. Reid's accident after the sun melted some of the snow and ice.[19] Mr. Reid testified that the conditions at the time of the photograph were better than they had been the night before. These photographs corroborated the testimony of the numer-

---

14. N.T. 01/18/05 p. 23.
15. N.T. 01/18/05 pp. 102-103.
16. N.T. 01/18/05 p. 68.
17. N.T. 01/18/05 p. 50.
18. N.T. 01/18/05 p. 55.
19. N.T. 01/18/05 p. 60.

ous witnesses that there were dangerous accumulations of ice and snow on the City's sidewalk at the time of the fall.

This court found that the credible evidence established that the City violated section 10-720 of its own ordinance governing snow removal from sidewalks. The City failed to clear the path of ice and snow and failed to clear a path for pedestrians of at least 30 inches in width. Based on the highly credible testimony offered at trial, this court found that hills and elevations of ice and snow existed on the City's sidewalk of such a size and character as to unreasonably obstruct travel and constitute a danger to pedestrians.

On the basis of credible testimony at trial, this court also found that the City had notice of the dangerous accumulations of ice and snow on its property. It was uncontested that Mr. Totten was the City employee responsible for clearing snow and ice from the 39th Police District's Yelland Street sidewalk. Mr. Totten admitted that, although he sprinkled rock salt, he did not use an ice pick which was necessary, and the accumulated ice and snow remained on the sidewalk by the time his shift ended at 3 p.m. on March 6, 2003.[20] This court found that Mr. Totten's failure to remove the dangerous accumulations of ice and snow on the City's sidewalk was negligent, and that the City had notice of the danger it presented to pedestrian travel through the actions of the very employee charged with keeping its Yelland Street property free from dangerous accumulations of ice and snow.

---

20. N.T. 01/18/05 pp. 96-97.

## 2. Parked Cars Compounded an Already Dangerous Condition

Credible testimony established that the City compounded an already dangerous condition of accumulated ice and snow by allowing its employees to park on the Yelland Street sidewalk. Mr. Totten testified that he had seen employees of the 39th Police District park on sidewalks adjacent to the 39th District Station "many times."[21] Mr. Totten also testified that he had received numerous complaints from residents about 39th Police District employees parking on the sidewalk.[22] Mr. Reid testified that the City employees from the 39th District consistently parked on the City's portion of the Yelland Street sidewalk and that these employees never received parking tickets.[23] Furthermore, Mr. Reid explained that "nobody [else] ever parks where that fence is at" except for the employees of the 39th Police District "because they'll give us a [parking] ticket. They'll give us a ticket fast."[24] Mr. Reid also stated that City employees parked on the City's portion of Yelland Street sidewalk more frequently at night than during the day.[25]

Mr. Reid testified that he and other Yelland Street residents had held numerous community meetings with representatives from the 39th Police District, and that Mr. Reid and others had voiced concerns over City employees parking on the City's portion of the Yelland Street

---

21. N.T. 01/18/05 p. 35.
22. N.T. 01/18/05 p. 33.
23. N.T. 01/18/05 pp. 56-58.
24. N.T. 01/18/05 p. 57.
25. N.T. 01/18/05 p. 55.

sidewalk.[26] Based on the credible testimony presented, this court found that City employees regularly parked on the Yelland Street sidewalk, that the City was aware of this practice, and that the City in fact had the ability to control this practice.

Mr. Reid testified that the presence of the City employees' cars on the sidewalk made it nearly impossible to see where he was walking on the evening of March 7, 2003.[27] The location of the City employees' cars on the sidewalk made it "awkward because you don't have any space to walk on the sidewalk,"[28] and the cars' location forced Mr. Reid to walk in an area that was covered with ice and snow.[29]

Based on the highly credible testimony presented, this court found that City employees at the 39th Police District had parked on the Yelland Street sidewalk, that the presence and location of these cars compounded an already dangerous condition. This court found that City's practice of allowing its employees to park on the sidewalk forced Mr. Reid to walk on a very narrow portion of the sidewalk that was already covered by dangerous accumulations of ice and snow, and severely restricted his ability to see where he was walking, also caused Mr. Reid's fall. The City had control of the sidewalk and prohibited residents but not its employees from parking on the sidewalk. The City failed in its duty to "keep [its] sidewalk property free from unreasonably unsafe and

---

26. N.T. 01/18/05 pp. 55-57.
27. N.T. 01/18/05 p. 55.
28. N.T. 01/18/05 p. 52.
29. N.T. 01/18/05 p. 51.

hazardous conditions so as to be safe for the pedestrian public to traverse."[30] This court further found, on the basis of credible evidence presented, that the City was negligent for allowing its employees to park on the sidewalk in light of the weather and sidewalk conditions in existence on the evening of March 7, 2003.

## III. LEGAL ANALYSIS

### A. *This Court Correctly Found the City Liable Under the Real Property Provision of the Tort Claims Act for Negligently Failing To Maintain the Sidewalk Adjoining Its Real Property*

The history of municipal and state immunity in Pennsylvania provides a relevant framework for resolving this case since the central issue is whether or not the City can be held responsible as it was at common law for negligently failing to maintain the sidewalk adjacent to the City's real property in a safe condition. When the Tort Claims Act was passed, it established immunity for municipal governments in some areas but held municipal governments responsible for negligent conduct in many areas where the government had responsibility at common law. The Tort Claims Act's real property provision required municipalities, like all property owners, to make the sidewalks next to their real property safe for pedestrian travel. The City's failure to comply with this duty

---

30. Plaintiff's civil action complaint at ¶¶6 and 13 and defendant's answer to plaintiff's complaint with new matter at ¶¶6 and 13.

in this case makes it liable for causing Mr. Reid's injuries.

## 1. Municipal Liability at Common Law

At common law, local municipalities did not enjoy absolute immunity but rather were primarily liable for negligence in their "proprietary" role of managing and using their own property, and secondarily liable in their governmental or "regulatory" role for failing to maintain roads, bridges and sidewalks. *Sherman v. City of Philadelphia,* 745 A.2d 95 (Pa. Commw. 2000). (citations omitted) "If the local agency was engaged in a proprietary function, then its liability was no different than that of a private citizen." *Id.* at 99 (citing *Honaman v. City of Philadelphia,* 322 Pa. 535, 185 A. 750 (1936)).

In *Sherman,* the Commonwealth Court provided a comprehensive historical overview of municipal governmental liability that existed prior to the Tort Claims Act. *Id.* The *Sherman* court discussed the two general types of municipal liability available under the common law: "primary" liability for direct "proprietary" negligence in the care and control of its own property, and "secondary" liability for negligence stemming from the municipal government's "regulatory" role. Specifically, *Sherman* court described:

"At common law there were two types of liability which could be imposed. The first, primary liability, is imposed on a party who is directly negligent. See *Vattimo v. Lower Bucks Hospital Inc.,* 502 Pa. 241, 465 A.2d 1231 (1983). Primary liability flows from the duty imposed on an individual or entity who owns or controls prop-

erty. An example is the duty imposed upon a property owner to keep the sidewalks in front of his property in good repair.

"Conversely, secondary liability 'rests upon a fault that is imputed or constructive only, being based on some legal relation[ship] between the parties, or arising from some positive rule of common or statutory law, or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.' *Builders Supply v. McCabe,* 366 Pa. 322, 328, 77 A.2d 368, 371 (1951). Our Supreme Court in *Builders Supply* further distinguished between primary and secondary liability as follows:

"The difference between primary and secondary liability is not based on a difference in *degrees* of negligence or on any doctrine of *comparative* negligence . . . . It depends on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal obligation owed by each of the wrongdoers to the injured person. Secondary liability exists, for example, . . . when a pedestrian is injured by falling in a hole in the pavement of a street; in such a case the abutting property owner is primarily liable because of his failure to maintain the pavement in proper condition, but the *municipality* is secondarily liable because of its having neglected to perform its duty of policing the streets and seeing to it that the property owners keep them in repair; if therefore the injured person chooses to bring suit against the *municipality* the latter can recover indemnity from the property owner for the damages which it has been called upon to pay.

"*Id.* at 328, 77 A.2d at 370. (second emphasis added) At common law, a local municipality was required to ensure that the owner of the property abutting a sidewalk within the right-of-way of a street that the municipality owned kept the property in good repair or that the municipality made the required repairs itself. *Fisher v. City of Philadelphia,* 112 Pa. Super. 226, 170 A. 875 (1934). That was never the law where the *Commonwealth* owned the highway or the right-of-way and the property owner negligently maintained the sidewalk. The Commonwealth was never liable in such a situation, even under a theory of secondary liability, because there was never an obligation on the Commonwealth to see to it that the abutting property owners along its miles of highway kept the property, including the sidewalks, in good repair." *Id.* at 99-100. (emphasis in original)

In *Sherman,* the Commonwealth Court emphasized that, *"both the Commonwealth and local agencies were always primarily liable for the negligence occasioned by their failure to maintain all of their real estate, **including the sidewalks** on their property abutting their own buildings." Id.* at 100 (emphasis in original) (citing *Osborne v. City of Pittsburgh,* 192 Pa. Super. 387, 161 A.2d 636 (1960)).

In a pair of decisions in the 1970s, the Pennsylvania Supreme Court abolished first municipal governmental immunity in *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973), and then state sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). In the short period following these decisions, the Common-

wealth and municipal governments were held liable in the same way as private entities. Importantly, *even before* the *Ayala* decision eliminated municipal immunity, municipalities were liable for negligence in failing to keep the sidewalks adjacent to their property safe for pedestrian travel. *Sherman,* 745 A.2d at 100.

## 2. The Tort Claims Act

In response to the decisions in *Ayala* and *Mayle,* the General Assembly, relying upon section 11[31] of the Pennsylvania Constitution, reinstated state and municipal immunity with the passage of the Sovereign Immunity Act, 42 Pa.C.S. §§8521-8528, and the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§8541-8564. The General Assembly, however, specified that there were certain exceptions where the state and municipal governments would remain liable for negligence. In many respects

---

31. Section 11 of the Declaration of Rights of the Pennsylvania Constitution provides as follows:

"All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the legislature may by law direct." Pa. Const. of 1790, Article IX, Section 11. See Donald Marritz "Courts To Be Open: Suits Against the Commonwealth," in *The Pennsylvania Constitution—A Treatise on Rights and Liberties,* 45 (Ken Gormley ed., 2004) (general history interpreting liability against the Commonwealth).

This constitutional provision's status as an "essential principle" of government that is "recognized and unalterably established" in the Declaration of Rights assures citizens the right to compensation for injuries and requires that any efforts to limit its protections should be evaluated with proper scrutiny.

these exceptions to immunity included areas where the state and municipal government previously had been responsible at common law. *Sherman.*

The Tort Claims Act created eight areas of potential municipal liability[32] provided that: (1) a municipality, or its employee acting in the scope of employment, was negligent, and (2) there was a basis for liability for negligence through statutory or common law. 42 Pa.C.S. §8542(a)(1) and (2). These eight areas of municipal liability generally track the two types of negligence that municipalities had been held responsible for at common law: primary liability for direct negligence in the care and control of its own property ("proprietary" negligence), and secondary liability for negligence stemming from the municipal government's regulatory role ("regulatory" negligence).

Specifically, the Tort Claims Act provides that a municipality can be primarily liable for direct negligence in its proprietary capacity for real property, personal property, vehicles and animals that are within its *"possession and control."* 42 Pa.C.S. §8542(b)(1)(2)(3) and (8). "Possession and control" are essential for liability for proprietary negligence to attach. *Id.*

The Tort Claims Act also provides for secondary municipal liability stemming from negligence in its regulatory role for "dangerous conditions of" trees, traffic controls, street lighting, utilities, streets and sidewalks. 42

---

32. "[A] local agency *shall* be liable for any damages on account of an injury to a person" if the agency's conduct falls within one of the eight enumerated exceptions to general municipal immunity. 42 Pa.C.S. §8542(a) and (b).

Pa.C.S. §8542(b)(4)(5)(6) and (7). However, liability in this regulatory context requires a greater showing recognizing the *different character of the wrong.* In order to hold the municipality responsible for an injury from a dangerous condition which may involve property under its "care, custody or control" *but not in its "possession,"* the municipality must have some notice of a dangerous condition, the injury suffered must be foreseeable and the municipality must have an opportunity to act. *Id.* Specifically, these sections all require that for municipal secondary liability to attach in the regulatory context, the following must be shown:

"(1) there be a 'dangerous condition' under the municipality's 'care, custody or control,' and

"(2) that 'the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred,' and

"(3) the municipality had 'actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.'" 42 Pa.C.S. §8542(b)(4)(5)(6) and (7).

The language of the "proprietary" liability provisions compared to the "regulatory" liability provisions reflects the differences in the type of wrong involved. Liability for "proprietary" negligence encompasses responsibilities that all owners, governmental or private, have over their own property and is considerably more expansive than that of the municipality for negligence in its "regulatory" role. "Proprietary" responsibility presumes that those in possession of property should maintain their own

property, know what condition it is in and exercise reasonable care for the safety of others. If the property in a municipality's possession creates a safety risk or is not maintained, the municipality is expected to be aware of it and to take immediate steps to make it safe. *Grieff v. Reisinger,* 548 Pa. 13, 16, 693 A.2d 195, 197 (1997); *Kilgore,* 553 Pa. at 28, 717 A.2d at 517.

By contrast, the liability for "regulatory" negligence for dangerous conditions of trees, traffic controls, street lighting, utilities, streets and sidewalks takes into account that, although a municipality may technically own these things, it is not in daily possession and should not be presumed to be aware of every dangerous condition that may exist on its property that extends throughout the municipality. In addition, the trees, traffic controls, street lighting, utilities, streets and sidewalks are benefits that the municipality provides to its citizenry, as compared to property that it uses for its own purposes. The Tort Claims Act requires reasonable notice of dangerous conditions on property not in its daily possession in order for the municipality to be held responsible for negligence for failing to prevent injuries.

Accordingly, in this case, since the City was the owner and possessor of the property adjacent to the sidewalk, this court found the City liable for negligently failing to keep the sidewalk safe from dangerous accumulations of ice and snow under the real property exception which provides as follows:

"(b) Acts Which May Impose Liability.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

"(3) *Real property.*—The *care, custody or control of real property in the possession of the local agency,* except that the local agency shall

"not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. As used in this paragraph, 'real property' shall not include:

"(i) trees, traffic signs, lights and other traffic controls, street lights and street lighting systems;

"(ii) facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within rights-of-way;

"(iii) streets; or

"(iv) sidewalks." 42 Pa.C.S. §8542(b)(3). (emphasis added)

The Tort Claims Act specifically exempted trees, traffic controls, street lighting, utilities, streets and sidewalks that are technically the municipalities' real property but that are typically not in the municipalities' daily "possession." These items, though real property, are exempted and covered under the regulatory provisions of liability which require more to establish culpability. 42 Pa.C.S. §8542(b)(4)(5)(6) and (7).

The Tort Claims Act's sidewalk provision states that a municipality may be liable for:

"(7) *Sidewalks.*—A *dangerous condition of sidewalks* within the rights-of-way of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a *reasonably*

*foreseeable risk* of the kind of injury which was incurred and that the local agency had actual *notice* or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition. When a local agency is liable for damages under this paragraph by reason of its power and authority to require installation and repair of sidewalks under the care, custody and control of other persons, the local agency shall be secondarily liable only and such other persons shall be primarily liable." 42 Pa.C.S. §8542(b)(7). (emphasis added)

The sidewalk provision subjects a municipality to narrower liability for the thousands of sidewalks technically owned by the municipality but that abut property possessed by private citizens. *Jones v. SEPTA,* 565 Pa. 211, 218-221, 772 A.2d 435, 440-42 (2001). The municipality is responsible secondarily and then only if it has "notice" of a "dangerous condition," the risk is "reasonably foreseeable," and the municipality has "sufficient time prior to the event to have taken measures to protect against the dangerous condition."

This court finds that this case should be analyzed under the real property provision because the sidewalk adjacent to the City's police station was under the City's "care, custody and control" and "possession." The City had a duty to maintain the property in a safe condition, including removing accumulated ice and snow, just as other property owners are required under the law. It is the City's failure to meet that duty that is at issue in this lawsuit.

### 3. Municipal Liability Under Real Property Provision for Failing to Maintain Sidewalks Adjacent to Their Real Property

The Tort Claims Act did not specify how to treat sidewalks which are adjacent to a municipality's real property. However, the Commonwealth Court's decision in *Sherman,* sitting en banc, addressed this very issue directly and found the City liable for a dangerous condition stemming from a defective sidewalk adjacent to the City's real property. 745 A.2d 95. The plurality opinion found the City liable for the adjacent property under the real property provision, *Sherman,* 745 A.2d at 105, whereas Judge Doris Smith, in a concurring and dissenting opinion, found the City liable as the owner of the abutting property under the sidewalk provision. *Sherman* at 108-109 (Smith, J., concurring and dissenting). Thus, even though members of the Commonwealth Court reached the decision in different ways, there was clear agreement *by a majority of the Commonwealth Court sitting en banc in* Sherman *that the City is liable for failing to maintain the sidewalk in a safe condition when it is the owner of the adjacent property.*

The *Sherman* plurality's discussion of its rationale that sidewalks adjacent to the municipality fall within the real property provision is instructive. First, the *Sherman* plurality describes the rationale for the two types of liability for sidewalks:

"[T]he liability imposed upon a local agency under the *real property* exception is primary, because *liability flows directly from the duty of the local agency as the*

*owner, possessor or custodian of the property* and not from any imputed duty. It would be liable in this respect as would the Commonwealth or any private landowner. *We must conclude, therefore, that, under the real estate exception, the local agency was intended to have the same duties as any private landowner to keep the property, **including the adjacent sidewalk,** which is part of its real estate, in good repair and that the local agency is **primarily** responsible for injuries which arise from its failure to do so. Flynn v. Chester,* 429 Pa. 170, 239 A.2d 322 (1968).

"Moreover, a local agency has the *additional* burden, as it did at common law, to keep sidewalks owned by others in good repair if the sidewalk is located within the right-of-way of streets it owns. In this situation, unlike the exception in section 8542(b)(3), a local agency is *only secondarily liable under section 8542 (b)(7), because the assumption is that it does **not** own the property,* and, therefore, its liability under the sidewalk exception flows from its common-law duty to keep the sidewalks within its jurisdiction in good repair. See *Restifo v. City of Philadelphia,* 151 Pa. Commw. 27, 617 A.2d 818 (1992). *Again, it must be stressed that a local agency's secondary liability does not flow from a breach of its duty as the owner of the real property adjacent to the sidewalk, but from its imputed duty to ensure that property owners keep their property, including the sidewalks adjacent thereto, in good repair. Flynn.*" 745 A.2d at 101. (emphasis added)

The *Sherman* plurality directly addressed the ambiguity of the language in the Tort Claims Act and concluded

that sidewalks adjacent to the municipalities' real property were meant to be included in the real property provision. This conclusion was based on *Sherman* plurality's "reading of the exceptions to governmental immunity, as well as the common-law theories of liability which they represent . . . ." *Id.* at 103. The *Sherman* plurality stated:

"We cannot believe that the General Assembly intended to impose liability on a local agency for an injury which occurred on a walkway to one of the agency's buildings, but not when that plaintiff is injured on a sidewalk adjacent to that building, yet likewise owned by it." *Id.*

This would create a disparity in liability for injuries that occurred on some parts of a municipality's real estate but not for injuries occurring on its sidewalks. *Id.* at 104. The plurality added that "[t]his anomaly has arisen, in part, as a result of the language employed in our construction of the exceptions to governmental immunity." *Id.* The *Sherman* plurality concluded that:

"[T]he General Assembly, when it was drafting the exceptions to governmental immunity, did not envision nor consider the situation where the local agency *owns* the property adjacent to the sidewalk on which the injury occurs and the Commonwealth owns the street abutting that sidewalk. Accordingly, we now hold that section 8542(b)(3), the real property exception, must be read as intending to exclude from the definition of real property, sidewalks, *except where those sidewalks are part of the real property owned by the local agency.*

"Although we acknowledge that this analysis clearly sets up an 'exception' to an exception in governmental immunity, thereby obliterating a distinction between sidewalks owned by a local government and those owned by private citizens, such an analysis is clearly reasonable and reaches a sensible result. If the local government owns the property adjacent to the sidewalk, its liability is primary, like that of the Commonwealth or any other private landowner. If, however, the local government does not own the property, its liability is merely secondary as the result of its common-law obligation, and section 8542(b)(7), to keep the sidewalks which abut its streets in good repair. In such an instance, liability would be imposed under the sidewalk exception as it has been in *Gray* and the cases preceding it.

"If we acknowledge that the General Assembly did not envision the present factual situation, *primary* liability would be properly imposed on the City in this case, not under the sidewalk exception, but under the real estate exception by virtue of the City's ownership of the Fire Administration Building and the sidewalk adjacent thereto. In essence, we read the General Assembly's exclusion of sidewalks from the definition of real property in the real estate exception to exclude only those sidewalks which the local agency is not primarily responsible for maintaining, *i.e.,* sidewalks which are adjacent to property owned by others." *Id.* at 105. (emphasis in original)

Judge Smith concurred in the result in *Sherman* of finding the City primarily liable for the sidewalk as the adjacent landowner but disagreed with the analysis. *Id.* at 106. Judge Smith analyzed the City's liability in *Sherman*

under the sidewalk provision but her conclusion also hinged on the City's role as owner and possessor of the adjacent property and its having the primary responsibility to maintain the sidewalk. Judge Smith stated:

"I believe that there is no question that *a municipality is primarily liable for injuries caused by dangerous conditions of sidewalks abutting its own property.* The last sentence of section 8542(b)(7) recognizes the different responsibilities of a municipality and renders it secondarily liable only where some other party is primarily liable." *Id.* at 109. (emphasis added)

Thus, regardless of what provision was relied upon for holding the City liable in *Sherman,* Judge Smith and the *Sherman* plurality focused on the same character of the wrong: a landowner's primary liability for propriatary negligence. The City in this case argued that *Sherman* was not controlling because it was a plurality opinion. This is incorrect because, even though there was a plurality opinion, both the plurality and Judge Smith found that the *City was primarily liable for its propriatary negligence as owner of the adjacent property for failing to maintain the sidewalk,* thereby creating a majority holding regardless of whether the real property or sidewalk provision is used to analyze the issue.

Recently, the Pennsylvania Supreme Court in *Walker v. Eleby,* 577 Pa. 104, 842 A.2d 389 (2004), discussed many of the concepts of primary and secondary liability discussed by the Commonwealth Court in *Sherman.* In *Walker,* the Supreme Court confirmed that there was a *Sherman* majority holding and stated that: "*the Commonwealth Court in* Sherman *found that the City was prima-*

*rily liable as the owner of the property adjacent to the sidewalk . . . .*" 577 Pa. at 108 n.5, 842 A.2d at 391 n.5 (2004). (emphasis added) There is a majority holding in *Sherman,* as the Supreme Court acknowledges, that the City is primarily liable for failing to maintain the sidewalk adjacent to property it possesses. *Id.*

In *Walker,* the Supreme Court discussed the reasoning of *Sherman* and analyzed the City's proprietary and regulatory functions relating to sidewalks similarly. The Supreme Court reached a result consistent with *Sherman* by focusing on who possessed the property adjacent to the sidewalk. *Id.* In *Walker,* the owner of the private property adjacent to the cracked sidewalk was found to be primarily liable and the City was found to be secondarily liable under the sidewalk exception which delineates that when "other persons" own the adjacent property the municipality is only secondarily liable. *Id.* at 109, 842 A.2d at 392; 42 Pa.C.S. §8542(b)(7) (see last sentence of provision). The *Walker* court held:

"Because the City owns Chestnut Street, the sidewalk where appellant fell is within the right of way of a street owned by the City, and section 8542(b)(7) applies. Therefore, the City can be held secondarily liable to appellant for her injuries." *Id.* at 126, 842 A.2d at 402.

The Commonwealth Court also held the City responsible for conditions on the sidewalk adjacent to its property in *White v. City of Philadelphia,* 712 A.2d 345 (Pa. Commw. 1998), a case decided prior to *Sherman* and *Walker.* In *White,* the Commonwealth Court grappled with the issue of who owned the sidewalk abutting the City's property, the Philadelphia Visitors Center, and

adjacent to a state highway. *Id.* at 348. In reaching its decision in *White,* Judge Smith, writing for the majority, stated that the legislative language setting forth immunity and its exceptions seemed to create "the anomalous and unjust result" that an injured person could not recover for an injury occurring on a sidewalk adjacent to the City-owned property. *Id.* at 348. The *White* court stated that the legislative language "plainly indicat[ed] that the legislature . . . intended to waive immunity for injuries caused by a defective condition of a municipality's streets, . . . or of its sidewalks . . . ." *Id.* at 347. (citations omitted) The court concluded that the City as the adjacent landowner was liable for dangerous conditions on the sidewalk relying on the sidewalk provision:

"[I]t is clear that the City owns the Philadelphia Visitors Center and that the sidewalk where the injury allegedly occurred therefore is adjacent to a property owned by the City. Absent any other considerations, the City would be the primarily liable owner of the sidewalk. Section 8542(b)(7) . . . ." *Id.* at 348.

Significantly, when *Sherman* was decided two years after *White,* both the plurality and Judge Smith agreed with the ultimate holding in *White* that the City was primarily liable for maintaining the sidewalks adjacent to property it owned and possessed. 745 A.2d at 104 (plurality—"we agree with the ultimate outcome in *White*") and 109 (Smith, J., concurring and dissenting). The *Sherman* plurality emphasized that the *White* holding "was based essentially upon a conclusion that the City *owned* the sidewalk." 745 A.2d at 102. (emphasis in original) (footnote omitted) The only disagreement was

whether the City's liability stemmed from the sidewalk provision or the real property provision. Thus *White* and *Sherman* stand for the proposition that if the City owns and possesses the property adjacent to the sidewalk it is *primarily* responsible in its proprietary role for maintaining the adjacent sidewalk for the safety of others.

In this case, the City admitted that it was the owner of the property adjacent to the sidewalk where Reid fell and that it had a duty to "keep [its] sidewalk property free from unreasonably unsafe and hazardous conditions so as to be safe for the pedestrian public to traverse." (Complaint at ¶¶6 and 13 and defendant's answer to plaintiff's complaint with new matter at ¶¶6 and 13.) The City argues, however, that even if it negligently failed to maintain the sidewalk it is immune from suit. *Sherman, White* and *Walker* make it clear that this is not the case: the City is primarily liable for proprietary negligence for sidewalks adjoining its real property.

### 4. Municipal Liability Under the Real Property Provision for Negligently Failing To Clear Dangerous Accumulations of Ice and Snow From Adjacent Sidewalks

#### a. *Common-law liability for dangerous accumulations of ice and snow and City employees acting in scope of employment were negligent*

Two specific preconditions must be satisfied before considering whether a municipality's conduct falls within one of the liability provisions of the Tort Claims Act:

"(1) the 'damages would be recoverable under common law or a statute' and

"(2) 'the injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties' with respect to one of the exceptions to immunity." 42 Pa.C.S. §8542(a)(1) and (2).

These two preconditions have been satisfied in this case.

First, under Pennsylvania common law, an abutting property owner is primarily liable for the removal of snow and ice from the sidewalk. *Strother v. Binkele,* 256 Pa. Super. 404, 411, 389 A.2d 1186, 1189 (1978); *Light v. Nanticoke City,* 38 D.&C.3d 369, 372 (1985); *Washington v. F. W. Woolworth Co.,* 17 Phila. 239, 244 (1988). If an owner of the property adjacent to the sidewalk fails to remove dangerous accumulations of ice and snow from the sidewalk and the condition is sufficiently dangerous to satisfy what has been referred to as the "hills and ridges" doctrine, then the owner is primarily liable for any resulting injuries. *Rinaldi v. Levine,* 406 Pa. 74, 176 A.2d 623 (1962).

Indeed, in this case the City admitted that it had a duty to "keep [its] sidewalk property free from unreasonably unsafe and hazardous conditions so as to be safe for the pedestrian public to traverse." (Complaint at ¶¶6 and 13 and defendant's answer to plaintiff's complaint with new matter at ¶¶6 and 13.) In fact, there was a City ordinance that required all adjacent property owners to clear their sidewalks of snow and ice.

Second, the injury in this case was caused by the City's employees' failure to meet this admitted duty to clear the sidewalk. It has been virtually undisputed that City employee Ray Totten was acting within the scope of his employment. Mr. Totten admitted that there was accumulated ice that he failed to remove prior to Mr. Reid's fall. The accumulated ice and snow caused Mr. Reid's fall and concomitant injuries. The court found that the City, through its employees acting in the scope of their employment, were negligent in failing to adequately clear the sidewalk of the accumulated ice and snow.

The City in this case argues strenuously that the Supreme Court's decision in *Finn v. City of Philadelphia,* 541 Pa. 596, 664 A.2d 1342 (1995), precludes municipal liability in this case. However, *Finn* is factually different from this case in a crucial respect. In *Finn,* "an unidentified individual or individuals deposited a foreign substance" on a sidewalk adjoining the City's property. 541 Pa. at 605, 664 A.2d at 1346. This accumulated grease or other substance caused a person to fall and suffer injuries. *Thus, in* Finn, *it was not the City's conduct that caused the injury but rather that of another unidentified person who was negligent.* In *Finn,* the plaintiff could not satisfy the second precondition to municipal liability under the Tort Claims Act, that of the City's negligent conduct causing the injury. 42 Pa.C.S. §8542(a)(2).

In *Finn,* the plaintiff argued that the City was secondarily liable under one of the "regulatory" liability provisions, the sidewalk provision, for the "dangerous condition of" the sidewalk caused by someone other than the City. 541 Pa. at 599, 664 A.2d at 1343. For reasons de-

scribed below, the Supreme Court held that the unidentified substance in *Finn* did not meet the narrower requirements for liability for a "dangerous condition" under the sidewalk exception. *Id.* at 605, 664 A.2d at 1346.

In contrast to *Finn,* in this case, Reid sought to hold the City primarily responsible in its "proprietary" capacity under the real property provision for its failure to perform its admitted duty of having its employees clear the sidewalks of ice and snow to make them safe for pedestrians as property owners are required to do under common law. Since the two preconditions to municipal liability have been met in this case, the central issue is whether the City is liable for negligently failing to maintain its sidewalk free from accumulated ice and snow under the real property provision of municipal liability.

### b. *Municipal liability for failing to maintain sidewalks in safe condition*

The real property provision includes broader liability for municipalities due to their ownership of the property and does not require that the injury be caused by "a dangerous condition" deriving from the property itself. Rather the City's liability under the real property provision stems from its negligence in failing to maintain the property for the safety of others, just as other property owners are required to do.

In *Grieff v. Reisinger,* 548 Pa. 13, 693 A.2d 195 (1997), the Pennsylvania Supreme Court provided guidance as to the extent of a municipality's liability for maintaining the safety of its real property. In *Grieff,* the municipality's fire chief negligently poured paint thinner on the fire

station's floor, causing a fire that engulfed and severely burned a woman. *Id.* The Supreme Court held that the municipality's conduct fell "squarely within the real property exception" because the municipality's own employee, the fire chief, was negligent and caused the injuries that occurred on its property. *Id.* at 17, 693 A.2d at 197. The Supreme Court explained:

"This case is unlike cases where the court held that the real property exception did not apply because the government's property only facilitated injuries *caused by third parties.* . . .

"The Fire Association's property did not facilitate an injury by a third party. Rather, Grieff's and the Fire Association's alleged negligent care of the property caused Reisinger's injury." *Id.* (emphasis added)

Once again, the *Grieff* decision demonstrates why the negligence caused by an "unidentified" party in *Finn* is inapposite to the facts in this case which revolve around the City's negligence.

The Supreme Court in *Grieff* discussed the differences between the sidewalk and real property provisions and stressed:

"*Finn* involved the sidewalk exception to governmental immunity—not the real property exception. These statutory exceptions to immunity are distinct. The sidewalk exception subjects a municipality to liability for negligence related to 'a dangerous condition of sidewalks' 42 Pa.C.S. §8542(b)(7). The *real property exception more broadly subjects a municipality to liability* for harm resulting from the negligent 'care, custody or control' of its

property. *Id.* §8542(b)(3)." *Id.* at 17 n.3, 693 A.2d at 197 n.3. (emphasis added)

The Supreme Court found *Finn* inapplicable to a case involving a municipality's *own* negligence in caring for its real property. *Grieff* at 17, 693 A.2d at 197. Primary liability for a City's own negligence is "broader" than its secondary liability for the negligent acts of others. In *Grieff,* the Supreme Court reversed the Commonwealth Court's conclusion that the real property exception did not apply because the defect did not arise from a defect of the property itself.

In light of the *Grieff* decision, the Supreme Court then overturned and remanded a series of Commonwealth Court decisions under the real property exception, signifying a turning point in the analysis of governmental immunity.[33] The Commonwealth Court commented on the significance of *Grieff* in *Hanna v. West Shore School District,* 717 A.2d 626 (Pa. Commw. 1998), one of the cases that the Supreme Court reversed and remanded after *Grieff:*

"*Grieff* is significant in that it represents a radical departure from the governmental immunity analysis previously set forth in a long line of appellate decisions in this Commonwealth. Yet, we can only surmise from the *Grieff* decision, as well as from the Supreme Court's reversal of our decision in this case, that, for governmental immunity purposes, *it is no longer of any consequence*

---

33. Specifically, the Supreme Court overturned three Commonwealth decisions in light of *Grieff: Schlacter v. Colonial School District,* 548 Pa. 414, 697 A.2d 587 (1997); *Hanna v. West Shore School District,* 548 Pa. 478, 698 A.2d 61 (1997); *Rearick v. City of New Kensington,* 550 Pa. 319, 705 A.2d 840 (1998).

*that the injury does not result from a defect in, or condition of, the real property itself,* and that the real property exception should no longer be considered in pari materia with the sidewalk exception to governmental immunity or the real estate exception to sovereign immunity." 717 A.2d at 629. (emphasis added) (footnote omitted)

After the Supreme Court remanded *Hanna* in light of its holding in *Grieff,* the Commonwealth Court held the municipality liable under real property provision for a municipal employee's negligence in leaving a puddle of water on the school corridor that caused someone to fall and suffer injuries.

Given the explicit guidance set forth by the Supreme Court in *Grieff* regarding the real property provision, any cases that precede the Pennsylvania Supreme Court's decision in *Grieff* in 1998 should be viewed with skepticism since they may no longer be binding precedent. Additionally, it is now clear that it is irrelevant in real property cases whether the injury is caused "from a defect in, or condition of, the real property itself . . . ." 717 A.2d at 629. Liability stems from the municipality's (or its employees') negligence in failing to safely maintain the real property.

Shortly after *Grieff,* the Supreme Court in *Kilgore v. City of Philadelphia,* 553 Pa. 22, 717 A.2d 514 (1998), dealt with the real property provision in a case factually almost identical to the one presented in this case. In *Kilgore,* a delivery person's foot was crushed when a co-employee lost control of a motorized tug on the City's property "due to an accumulation of ice and snow on the roadway from an earlier snowstorm." *Id.* at 24, 717 A.2d

at 515. The Supreme Court found that the City[34] could be negligent under the real property exception for failing to clear the accumulated ice and snow from a roadway.

The *Kilgore* court reached this conclusion notwithstanding the fact that the real property provision exempts "streets,"[35] like "sidewalks," from coverage as real property. The Supreme Court did not interpret the real property provision as excluding all City roadways even when those roadways are part of or adjacent to the City's real property. *Id.* According to the Supreme Court, the City's liability hinged on the trial court's finding that "the City owned the roadway in question and was responsible for clearing it of accumulated ice and snow." *Id.* at 25 n.1, 717 A.2d at 515 n.1. The plaintiffs alleged that the City negligently failed to maintain its property. The Supreme Court explained the application of the real property provision in the context of accumulated ice and snow:

"[T]he City's failure to remove ice and snow following an earlier storm was related to the 'care, custody and control of real property in *possession* of the local agency,' 42 Pa.C.S. §8542(b)(3) and was a direct cause of the

---

34. The City of Philadelphia was the local agency that owned Philadelphia International Airport.

35. The Pennsylvania Vehicle Code defines "roadway" but not "streets." Its definition of roadway makes it clear that the terms are synonymous:

" 'Roadway.' That portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder even though such sidewalk, berm or shoulder is used by pedalcycles. In the event a highway includes two or more separate roadways the term 'roadway' refers to each roadway separately but not to all such roadways collectively." 75 Pa.C.S. §102.

accident. Thus, the Kilgores satisfy the requirement that the injury occurred as a result of one of the eight enumerated acts in 42 Pa.C.S. §8542(b)." 553 Pa. at 28, 717 A.2d at 517. (emphasis added)

In *Jones v. SEPTA,* 565 Pa. 211, 772 A.2d 435 (2001), the Pennsylvania Supreme Court once again discussed liability under the real property provision for municipal liability as compared to the sidewalk provision for municipal liability. In *Jones,* the Supreme Court referred to its holdings in *Grieff* and *Kilgore* and stated that those holdings: "held that allegations that a governmental agency was negligent in the care of its real property were encompassed by the Tort Claims Act's real estate exception. *Grieff,* 693 A.2d at 197; *Kilgore,* 717 A.2d at 517. Our decision was premised on the 'care, custody and control' language of the exception. Indeed, it was this language that compelled an outcome that differed from that in *Finn." Id.* at 222, 772 A.2d at 442.

*Jones* involved a claim against the Commonwealth, not a municipality, by a person who was injured when she fell on rock salt on a SEPTA platform. The plaintiff in *Jones* sought liability against the Commonwealth under the Sovereign Immunity Act's real property provision which includes coverage for its sidewalks. However, the Commonwealth has greater immunity under its real property provision than do municipalities. Under the Sovereign Immunity Act, the Commonwealth's liability for its real property requires that the injury is caused by "a dangerous condition of " the property and its language mirrors that used under the Tort Claims Act's sidewalk provision. The requirement of demonstrating a "danger-

ous condition of " property is much more difficult than what is required under the municipal real property provision which only requires that the municipality was negligent in its "care, custody and control" of real property in its possession. *Id.* The *Jones* court explained the difference in the language holding the Commonwealth liable for its adjacent sidewalks and the language holding a municipality liable for adjacent sidewalks:

"[T]he language the legislature chose for subjecting the Commonwealth to liability under [the Commonwealth's real property provision] 42 Pa.C.S. §8522(b)(4) —'a dangerous condition of Commonwealth agency real estate'—varies markedly from the language it chose for subjecting a local agency to liability under [the municipality's real property provision] 42 Pa.C.S. §8542(b)(3) —the 'care, custody or control of real property . . . .' See *Kilgore,* 717 A.2d at 518 n.6; *Grieff,* 693 A.2d at 197 n.3. Because the words the General Assembly used in the Sovereign Immunity Act are one way and the words it used in the Tort Claims Act are another, we are of the view that the legislature did not intend that section 8422(b)(4) [the Commonwealth's real property provision] and section 8542(b)(3) [the municipality's real property provision] be interpreted in lockstep." *Id.* at 226, 772 A.2d at 444.

*Jones* therefore crystallizes what the Supreme Court previously set forth in *Grieff* and *Kilgore,* that the real property provision "more broadly subjects a municipality to liability for harm resulting from the negligent 'care, custody or control' of its property" than the municipal sidewalk provision of the Tort Claims Act or the Com-

monwealth's real property provision under the Sovereign Immunity Act. *Grieff,* 548 Pa. at 17 n.3, 693 A.2d at 197 n.3; *Jones,* 565 Pa. at 223, 772 A.2d at 442.

Thus, the Tort Claims Act preserves the City's primary responsibility at common law stemming from its proprietary role to maintain the sidewalk in a safe condition when it is the owner of the adjacent property. Since the City is the adjacent property owner, the real property provision applies in this case. *Sherman, Kilgore* and *White.* The City conceded its duty to maintain the sidewalk for pedestrians. The City's own employees' negligent failure to maintain its adjacent sidewalk free from accumulated ice and snow subjects it to liability for causing Mr. Reid's injuries. *Grieff, Kilgore* and *Jones.* Finally, *Finn* does not apply to this case as Mr. Reid seeks to hold the City responsible for the City's own conduct under the real property exception rather than for an unidentified party's conduct under the City's regulatory role.

### B. *This Court Had Ample Credible Evidence To Find That The Sidewalk Conditions Satisfied the Hills and Ridges Doctrine*

The City challenges this court's findings of fact, contending that Mr. Reid did not fall on "hills and ridges" of ice and snow. The City's claim is best characterized as a "weight of the evidence" claim, and the Supreme Court in reviewing an appeal from a bench trial has stated that the standard of review is limited to whether or not this court abused its discretion:

"The proper standard of review for an appellate court when examining the lower court's refusal to grant a judg-

ment n.o.v. is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. . . . Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. . . . Absent an abuse of discretion, the trial court's determination will not be disturbed." *Adamski v. Miller,* 545 Pa. 316, 319, 681 A.2d 171, 173 (1996). (citations omitted)

Under Pennsylvania law, an abutting property owner is primarily liable for the removal of snow and ice from the sidewalk. *Strother v. Binkele,* 256 Pa. Super. 404, 411, 389 A.2d 1186, 1189 (1978); *Light v. Nanticoke City,* 38 D.&C.3d 369, 372 (1985); *Washington v. F. W. Woolworth Co.,* 17 Phila. 239, 244 (1988). In this instance, the City has admitted that it owns the property abutting the Yelland Street sidewalk upon which Mr. Reid fell, so the issue is whether the plaintiff has proved those elements of the "hills and ridges" doctrine necessary for imposing liability on the City for failing to remove the ice and snow.

The Supreme Court set forth what a plaintiff must prove under the hills and ridges doctrine in *Rinaldi v. Levine,* 406 Pa. 74, 176 A.2d 623 (1962):

"Where a property owner is charged with negligence in permitting the accumulation of snow or ice on his sidewalk, the proof necessary to sustain such a charge has been clearly defined by our decisional law. It is encumbent upon a plaintiff in such situation to prove: (1) that snow and ice had accumulated on the sidewalk in ridges or elevations of such size and character as to unreason-

ably obstruct travel and constitute a danger to pedestrians travelling thereon; (2) that the property owner had notice, either actual or constructive, of the existence of such condition; and (3) that it was the dangerous accumulation of snow and ice which caused the plaintiff to fall. Absent proof of *all* such facts, plaintiff has no basis for recovery." 406 Pa. at 78-79, 176 A.2d at 625-26. (emphasis in original)

This court found that the conditions on the sidewalk in existence at the time of Mr. Reid's fall satisfied the "hills and ridges" doctrine. This court found that the snow and ice had accumulated on the City's portion of the Yelland Street sidewalk in ridges or elevations of such size and character as to unreasonably obstruct travel and constitute a danger to pedestrians. Mr. Reid described the accumulation as "bad . . . a lot worse than we thought," and the paramedic, Mr. Kearney, noted that the area was "crunchy in a lot of places" from snow. The City's main witness, Mr. Totten, admitted that there was an accumulation of thick ice on the sidewalk before Mr. Reid fell. Mr. Totten admitted that the ice was so thick that he needed an ice pick to remove it but that then he failed to use the ice pick he had been given. Instead, Mr. Totten sprinkled rock salt so as to give pedestrians a better footing on the obstruction but he conceded that the rock salt did not eliminate the thick accumulation of ice. The photographs taken of the sidewalk, after warmer weather had reduced the ice and snow, corroborate this testimony. There was ample credible evidence that snow and ice had accumulated in elevations that unreasonably obstructed travel and caused a danger to pedestrian travel.

This court also found that the City had notice of the existence of the conditions on its sidewalk, because the City's employee charged with maintaining the sidewalk admitted that the ice that accumulated prior to Mr. Reid's fall was too thick to be cleared without special tools.

Finally, this court found that Mr. Reid fell because of the accumulation of ice and snow. Mr. Reid testified credibly that the ice and snow caused him to fall, and this testimony was uncontroverted. This court was presented with ample evidence of hills and ridges of ice and snow, and did not abuse its discretion by finding that Mr. Reid fell on a dangerous accumulation of ice and snow that satisfied the hills and ridges doctrine.

This court found that the City was negligent for allowing City employees working at the 39th Police District to park on the Yelland Street sidewalk during the inclement weather conditions that existed on March 7, 2003. The City had notice that their employees parked on their sidewalks, as shown by Mr. Reid's testimony that he and other citizens had voiced concerns about the City employees' parking practice, and Mr. Totten's testimony that he had received complaints. Mr. Reid also testified credibly that the City employees working at the 39th District were not ticketed, but local residents who parked on the sidewalk were ticketed. This court found that the City had notice of, and control over, the practice of City employees parking on the Yelland Street sidewalk. The City negligently failed to maintain the sidewalk safe for pedestrian traffic by allowing its employees to park on the ice and snow covered sidewalk. Furthermore, this court found that City employees had

90

parked on the City's Yelland Street sidewalk on the evening of March 7, 2003, and that the presence of these cars both restricted the amount of space on the sidewalk in which Mr. Reid had to maneuver and forced him to walk directly on the dangerous accumulation of ice and snow.

Based on these findings, this court concluded, by the credible evidence presented, that the City was negligent for failing to maintain the sidewalk safe for pedestrian travel by allowing its employees to park on the ice and snow covered sidewalk, compounding the existing unsafe condition of accumulated ice and snow.

## IV. CONCLUSION

For the above stated reasons, the Commonwealth Court should affirm this court's findings and judgment.